# IN THE SUPREME COURT OF TEXAS

No. 19-0410

APACHE CORPORATION, PETITIONER,

v.

CATHRYN C. DAVIS, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued March 23, 2021**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

JUSTICE BUSBY and JUSTICE BLAND did not participate in the decision.

In 1995, in *Texas Department of Human Services v. Hinds*, we held that an employee claiming retaliation must prove that but for his protected conduct, his employer's prohibited conduct "would not have occurred when it did."[1] Just last Term, in *Office of Attorney General v. Rodriguez*, we emphasized that "[a]n adverse employment action 'based solely' on reasons unrelated to [protected conduct] destroys the causal link."[2] Because evidence of but-for causation is often circumstantial, we have suggested several factors that may be considered in determining

---

[1] 904 S.W.2d 629, 636 (Tex. 1995); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 488–489 (5th Cir. 2004) ("Therefore, a plaintiff asserting a retaliation claim must establish that without his protected activity, the employer's prohibited conduct would not have occurred when it did." (cleaned up)).

[2] 605 S.W.3d 183, 192 (Tex. 2020).

whether the standard of proof has been met.[3] In this case, we explain the factors' role in applying the causation standard when evidence shows that the employer took action against the employee for a legitimate reason unrelated to the employee's protected conduct. The trial court rendered judgment against petitioner employer on respondent employee's claim of retaliation based on the jury's finding that Petitioner discharged Respondent for complaining in an email of gender discrimination. The court of appeals affirmed.[4] We conclude that there is no evidence to support the jury's finding that but for Respondent's complaint of gender discrimination in her email, Petitioner would not have terminated her employment when it did. Accordingly, we reverse the court of appeals' judgment and render judgment for Petitioner.

## I

## A

Petitioner Apache Corp. is a Fortune 500 business engaged in hydrocarbon exploration and production. In 2006, Apache hired Respondent, Cathryn Davis, then 52, for the job of Senior Paralegal in its Houston litigation department. She joined two other paralegals in the department that Apache had hired four or five years earlier. Both were younger women: Laurie Fielder, then 32, also a Senior Paralegal, and Courtney Eldridge, then 27, whose title was Paralegal. A year after Davis' hire, attorney Dominic Ricotta, 42, became head of the department. All parties agree that

---

[3] For instance, we explained in *Alamo Heights Independent School District v. Clark* that:

> In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false.

544 S.W.3d 755, 790 (Tex. 2018); *see also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000) (listing the same factors, except for the first); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450–451 (Tex. 1996) (same).

[4] 573 S.W.3d 475, 482 (Tex. App.—Houston [14th Dist.] 2019) (substitute opinion).

Davis and Ricotta worked well together for the first few years of his tenure and that Davis received strong performance ratings.

Davis' and Ricotta's relationship began to sour in 2010. That fall, Ricotta announced that Eldridge had been promoted to Senior Paralegal, giving her the same title as Davis, and that E-Discovery Coordinator had been added to Fielder's title. Eldridge's base salary remained lower than Davis'. Fielder's new title reflected e-discovery work that she had already been doing for Apache, and it came with a slight pay bump, raising her base salary to $4,400 above Davis'.

Davis was embarrassed that she did not receive a promotion or additional responsibilities at the same time as the others. In November, Davis approached Ricotta about a promotion for herself. She testified that Ricotta seemed angry with her for asking and responded in a mocking tone that the only way for her to be promoted would be to become a lawyer. Davis further testified that Ricotta told her that he could have an accountant perform some of her work for less pay, such as reconciling outside counsel's legal bills, and that Ricotta threatened to cut her salary. Ricotta has a different view of these conversations. He testified that Davis already held the highest rank of Senior Paralegal and that Fielder's new adjunct title of E-Discovery Coordinator reflected specific expertise that she had developed and that Davis lacked.

Davis turned to an employment lawyer at Apache, David Bernal. She relayed her conversations with Ricotta and complained that she did not understand why she had been passed over for a promotion when she was "old enough to be [Eldridge's and Fielder's] mother" and "had twice as much experience." After their short meeting, Bernal sent Ricotta an email reporting the content of his interaction with Davis. Ultimately, at Davis' request, Legal Research Specialist was added to her Senior Paralegal title, though it did not come with an increase in salary.

**B**

Apache's official business hours were 7:30 a.m. to 5:30 p.m., Monday through Thursday, and 7:30 a.m. to 11:30 a.m. on Friday. Ricotta traveled frequently and, before the fall of 2012, permitted employees to work flexible schedules and monitor their own hours. Davis took advantage of that flexibility and usually arrived between 9:00 a.m. and 10:00 a.m., staying later into the night. On Tuesdays and Thursdays, she took a midday break for a few hours to drive her daughter to and from college classes. Davis also worked extensive overtime on her own initiative without first obtaining Ricotta's approval.

In November 2012, as a cost-saving measure, Apache directed its department heads to manage employee schedules more proactively and to require them to more closely track Apache's official business hours. On Monday, November 12, Ricotta emailed all litigation-department employees instructing them to submit a proposed 40-hour workweek schedule for 2013. The email stated that "[c]ompany policy controls" and that "[r]egular business hours are preferred" but also that Ricotta would "consider requests to adjust this schedule within reason." The email gave as examples of a reasonable adjustment 6:30 a.m. to 4:30 p.m. or 8:00 a.m. to 6:00 p.m. The email also specified that "[o]vertime by [eligible] employees must be approved by [Ricotta] in advance" and that "[t]he request should be time specific, not project specific." If Ricotta could not be reached, the email advised, the employee's "supervising attorney [could] consider the request and . . . keep [Ricotta] apprised." The email asked that scheduling-accommodation requests be sent to Ricotta by Wednesday of that week.

Davis responded by email the same day, stating that she would "like to continue to have the same flexible work schedule that [Ricotta had] supported for several years" and citing as the reason her need to drive her daughter to and from college. Davis acknowledged that Ricotta's

4

"change in . . . position on overtime" was likely due to "[c]ompany interests and the current economy" and stated that she would "be glad to stop working over and above regular hours immediately". But, Davis added, she hoped that she had earned Ricotta's trust enough that she "would not have to ask every time" she needed to work "a few extra hours" to meet a deadline.

Later that day, Davis again emailed Ricotta stating that she could not submit a final schedule until her daughter registered for classes for the spring semester. Her best guess, she wrote, was that it would be the same schedule she had been working: "Monday, Wednesday, Friday – usually arriving between 9:00 a.m. and 10:00 a.m. but staying late (quite often until 9:30 p.m.)" and "Tuesday & Thursday – 9:00 a.m. until 12:30 p.m.; then 2:30 p.m. until 8:00 p.m. (however, I was usually staying even later than this)." In response, Ricotta asked Davis to "try to fit as many of the 40 hours as possible inside normal Apache business hours."

Late that night, Davis sent Ricotta a long email about a recent feature in the *Houston Chronicle* profiling the "100 Best Places to Work in Houston as Chosen by Employees." Davis pointed out that "unfortunately," Apache was not on the paper's list but added that she knew "Apache [had] the potential to make [the] list for 2013 if it would only decide to make that a goal." In several paragraphs, Davis explained how "the 'best' places to work seemed to raise the standard on how management show[s] respect to all their employees" by "implement[ing] an employee-centered culture" and "promoting family-friendly flexibility". She opined that "when management . . . extends 'flexibility,' the appreciation, loyalty, hard work, and innovation of employees skyrocket[]". But "the thought that the little flexibility that we need to balance our work and home life is being threatened", she said, "can be very disheartening and actually consume[] what would otherwise be very productive time." She closed by telling Ricotta, "we pray for your discernment."

Whether Ricotta responded to Davis' email is unclear. But a few days later, on November 14, Davis sent Ricotta another email stating that "if a 40-hour work week [was] to become [her] new norm, and if [she could] adjust [her] schedule to transport [her] daughter to college on Tuesdays and Thursdays, [she] should be able to start each work day between 8:30 a.m. and 9:00 a.m." At that point, Ricotta contacted Mark Forbes, the manager of Apache's Human Resources Department for North America. On November 15, Forbes emailed Ricotta that it was "time to have a blunt discussion" with Davis and "place a note in her file regarding [her] not following supervisor direction, the expectation that business requirements and schedules be followed, the extra management time required to address her demands and the fragmented work product as a result of [her] working odd hours on an unapproved schedule." Forbes advised Ricotta to "explain that business needs [only] allow[ed] [Ricotta] to approve a schedule that fits [within] the corporate policy"; that Davis' "request for a schedule outside the policy [could not] be supported"; and that Davis therefore could not "leave during the day to transport her daughter."

The next morning, November 16, Ricotta emailed Davis that she would need to submit a compliant schedule:

> Cathy: Business needs, as reflected in company policy, allow me to approve a schedule that fits within that policy. The policy permits a supervisor to approve flextime within established parameters. While I appreciate your efforts, your suggested arrival time of 9:00 a.m. falls outside of the parameters of company policy. Your suggested arrival time of 8:30 a.m. would satisfy company policy and would be acceptable to me if you were able to work until 6:30 p.m. with one hour for lunch.

> (A schedule of 8:30 a.m. to 6:30 p.m. is one of the examples of flextime given in the company policy.) It also achieves the objective of working as many hours as possible inside of the normal Apache business hours while accommodating your request for flextime under the policy.

Please adjust your proposed regular schedule so that it complies with the policy's established parameters and re-submit it to me for review.

Thank you. Nick

A few hours later, Davis responded with yet another email "resubmit[ting] [her] request that [her] schedule start each day between 8:30 a.m. and 9:00 a.m. so that [she could] continue to transport [her] daughter to college on Tuesdays and Thursdays." Davis never submitted a schedule that complied with Apache's business-hours policy. She was the only one in the department who did not.

## C

On November 29, Davis requested leave time for that afternoon and the following day. That morning Ricotta had asked Davis to do some research. Davis notified Ricotta that she would not be able to complete it before she left and asked for overtime approval to complete the project over the weekend. Ricotta responded that the project could wait until Davis returned to the office and that overtime work was not necessary. Nonetheless, Davis stayed up all night, working 12 hours of overtime to finish the research. Ricotta reminded Davis that "[t]his [was] the second time in recent weeks [that she had] worked overtime without [his] approval" and stated that he "expect[ed] [Davis] to follow [his] instruction regarding overtime without exception." Ricotta testified at trial that when he sent that email, his readiness to fire Davis for insubordination was "about an eight" on a scale of one to ten and that Forbes' readiness was "at a ten."

Davis spent the weekend preparing a long email with the subject line "CONFIDENTIAL - Notice of Discrimination Claim", which she sent the next Monday, December 3, to Ricotta, Forbes, and Bernal, the Apache employment lawyer to whom she had complained a year earlier about not receiving a promotion. In the email, Davis charged Ricotta with "creat[ing] a hostile work environment for me" through "beat downs"; "intimidation";

"refus[ing] to discuss issues relative to [her] career advancement"; "devastating", "disparaging", "derisive", and "hateful" words and remarks; a "radical attitude"; "negative and confusing responses"; and "perplexing and inconsistent behavior". "[M]ost of all," Davis continued, "your behavior offends my sense of propriety and decency". "[T]his offensive conduct is unwelcome and it will no longer be tolerated by me."

Davis acknowledged in her email that Ricotta was probably preparing to fire her. "[I]n the past few weeks," she wrote to Ricotta, "you have deliberately intensified your derisive words toward me [and] have begun setting me up for failure". "It seems only a matter of time," she added, "before you take the 'kill shot.'" Davis strongly suggested she would sue Apache if terminated. She charged Ricotta with having a "plan to circumvent legal challenges to the 'age discrimination' and 'woman discrimination' components" of her termination. If Ricotta proceeded, Davis wrote, "with God's grace, I am prepared to take this claim to another level. Please note I have done my homework" on Apache's potential liability. "[Y]ou are certainly aware," she wrote, "that the law has made it illegal to fire, demote, harass, or otherwise retaliate against an employee because he/she has complained about discriminatory practices."

But Davis' only complaint of discrimination in her lengthy email was that she had "observed and experienced the Company's pervasive negative attitude toward advancing or recognizing the contributions or accomplishments of its female employees." "Enough said on that for now", she then wrote. Davis' email did not describe any specific instance of discriminatory conduct. Because Davis' December 3 email forms the basis of her lawsuit, we reprint it in full:

> Nick,
>
> It is with deep regret that after working for you so loyally for over five years at Apache Corporation that I must formally claim that you have created a hostile work environment for me in the Legal Department, and despite my numerous attempts to discuss these issues with you to find resolution, you will not do so. Therefore, I am

also hereby reporting this to the Company via our HR Lawyer, David Bernal, and the Director of HR-North America, Mark Forbes. In the near future, I will describe certain particular abusive incidents and provide evidence of emails where you have belittled and bullied me, especially during the past two weeks, and almost on a daily basis.

I know that you are aware that your beat downs, intimidation, refusal to discuss these issues with me, and refusal to discuss issues relative to career advancement have caused me great emotional distress because many of our discussions have ended with me in tears, yet you appeared to be indifferent and never expressed remorse. In fact, as I told you some months ago, your devastating words to me caused nearly a year of depression and prompted me to seek employment in the office of the Company's Corporate Secretary (and elsewhere). Other emotional health issues that I have experienced as a direct result of your disparaging remarks include increased stress, repetitive anxiety provoking thoughts about these events, and persistent shedding of tears while traveling to and from work. I have also experienced negative physical health issues, including convulsive breathing, increased heart rate, sleep deprivation from the increased stress (which professionals maintain shorten life), and escalated blood pressure (which could lead to a stroke). Still, I strove to be positive in my attitude toward you and I continued to produce excellent work. If this doesn't evoke any empathy from you, perhaps you should imagine your reaction if your wife or daughter was subjected to similar offensive behavior.

I believe that in the past few weeks, you have deliberately intensified your derisive words toward me, have begun setting me up for failure, and have taken a radical attitude against the long-established flextime of your team (despite our incredible success) that made it possible for us to balance family responsibilities. It seems only a matter of time before you take the "kill shot." And so once again, I found myself incredibly confounded by your extreme swing in behavior which came within days after addressing your work requests as first priority and successfully completing two back-to-back projects for you and for Anthony Lannie's review with considerable overtime, to the detriment of time I also needed to spend on discovery for another Company lawyer.

After experiencing such negative and confusing responses from you, and knowing that you have complete loyalty to the Company, it appears that the Company's stated core values of "Invest in our greatest asset: our people" and "Treat our stakeholders with respect and dignity" are just on the books for looks, while the actual management style toward employees is intimidation, degradation, humiliation, and then termination.

Moreover, with the recent intensity and frequency of your hateful words and the nature of your perplexing and inconsistent behavior, I have concluded that you are trying to either drive me out of Apache or are preparing to dismiss me after setting me up to fail. And it has not escaped me that you have already taken a few steps to overcome the void that will exist on our litigation team after you accomplish my

termination and complete your plan to circumvent legal challenges to the "age discrimination" and "woman discrimination" components, which violate both Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. But most of all, your behavior offends my sense of propriety and decency in that you would conceive a plan to lay off one of your "team" members who has been especially loyal and hard-working, not to mention that you would go to such lengths to persecute and then terminate a single parent who has no other household income. It is this epitome of undeserved hostility and betrayal that prompts my formal claim.

Please note that although I only briefly touched upon the "woman discrimination" aspect of my claim, I have observed and experienced the Company's pervasive negative attitude toward advancing or recognizing the contributions or accomplishments of its female employees. Enough said on that for now; I will elaborate on this issue when I provide the details to the incidents which I reference herein.

I maintain that you have absolutely no justification for your hostile conduct because I have been a dedicated, loyal, and excellent employee, having consistently provided excellent work to you, to the other litigators, and even to Company lawyers in other legal groups from time to time, as approved by you. Moreover, I have been willing to work hours well over and above the normal work load (350+ overtime hours this past year alone), and have initiated a number of excellent ideas which I have then put into practice for promoting the distribution of legal information and for promoting the camaraderie within the department, all of which are ultimately credited to you.

I do not bring this claim out of any animosity or from any power of my own, as you are far superior to me in intelligence, logic, and legal strategy. I simply bring this claim in honesty and hopefulness.

Nevertheless, I advise that this offensive conduct is unwelcome and it will no longer be tolerated by me. Clearly, although you are a brilliant litigator who has successfully pounded numerous adversaries into the dust, you must stop the intimidation and sabotage of your loyal paralegal. However, if you choose to use your power, position, and legal expertise to make a bigger issue out of this claim, with God's grace, I am prepared to take this claim to another level. Please note that I have done my homework and am well aware that the Company is automatically liable for harassment by a supervisor that results in a negative employment action such as termination, failure to promote, and loss of wages. Furthermore, the Company is also liable if it fails to take prompt and appropriate corrective action. And it goes almost without saying that you are certainly aware that the law has made it illegal to fire, demote, harass, or otherwise retaliate against an employee because he/she has complained about discriminatory practices.

Not to minimize the egregious nature of your intimidating behavior, your plan to terminate me without cause, and your plan to circumvent the law, to your credit, in the past, I had appreciated your dedication to work and detail, your honor to your supervisor, your leadership and energy, and the interesting projects which you shared with me.

Again, I want to express my heartfelt disappointment in having to put this claim in writing and having to bring it to Company attention. I will continue to pray for you and hope that in time, our work relationship can be restored and that we may experience mutual trust and respect.

Cathy Davis

Bernal immediately emailed Davis—copying Forbes, but not Ricotta—assuring her that "Apache takes all allegations and complaints of harassment seriously" and that he "would conduct a prompt and thorough investigation of [her] allegations." Because Bernal reported to Ricotta, he asked Davis if she was comfortable with his participation in the investigation, and she replied that she "definitely" wanted him to be involved. Over the next several weeks, Bernal and Forbes interviewed Davis and other members of the legal department. On January 9, Bernal notified Davis by email that he and Forbes had concluded their investigation, "found no evidence of discrimination", and were closing the file.

Ricotta testified that after Bernal closed his investigation, he (Ricotta) talked to "pretty much everyone in the Legal Division Group" to learn more about Davis' allegations because he was "entitled as the manager to pick up where [he had] left off in dealing with her insubordination behavior". Other employees told him, he testified, that Davis was trying to "stoke a rebellion over the [office hours] policy". Ricotta also learned that some lawyers in the group preferred not to work with Davis. One, Andrew Friedberg, testified that he had informed Ricotta of his preference not to work with Davis because "[i]n terms of . . . the working relationship, often times things were more difficult than they had to be." Friedberg gave an example in which he "expressly told her to spend no more than one hour" working on a project, "[a]nd then the next morning when [he] came

in", Davis appeared to be in the same clothes because "[s]he had worked all night". Friedberg and another department employee, administrative assistant Terri Caldwell, also testified that Davis had initiated emails or discussions at work that involved bizarre political or religious theories.

Davis testified that after her email, Ricotta ostracized her and refused to assign her any substantive work. Bernal testified that Davis told him "that even with the investigation done . . . she could not trust Mr. Ricotta" and "did not want to work with" him. Bernal also testified that Davis had asked Bernal if "she [could] just work for [him]." Bernal testified that such an arrangement would be impossible because Ricotta was "the head of the Litigation Department" and "[t]o start cherry picking who you work for and not work for is not what we do, and it's not what legal assistants do." Bernal testified that he told Ricotta about Davis' desire not to work with him and warned him "[i]n no uncertain terms" that he could not "retaliate against Ms. Davis" for her December 3 email. Bernal cautioned Ricotta that his deliberations about Davis' continued employment should be limited to the "pre-complaint" and "post-investigation" time frames, though he also acknowledged telling Ricotta that "in [his] view[,] [Ricotta] had no choice" but "to terminate Ms. Davis."

Forbes testified that between November 2012 and January 2013, he had discussions with Ricotta about Davis' employment in which he recommended to Ricotta that Davis be terminated. "[H]ad she been my employee back in November she would have been asked to leave the Company then", he said. Apache's General Counsel, Anthony Lannie, also testified that he "told [Ricotta] to terminate [Davis]" and that Davis "should have been terminated long before she was."

In January 2013, Ricotta recommended to Apache's Human Resources Department that Davis be terminated. On January 25, 2013, after the decision was approved, Ricotta and Forbes

notified Davis of her termination in person. Davis was 59 at the time. The paralegal Apache hired to replace her was a 51-year-old woman.

## D

Davis filed an EEOC complaint with the Texas Workforce Commission (TWC). The complaint asserted only age discrimination and never mentioned gender discrimination. After receiving a right-to-sue letter, Davis filed suit in May 2013 asserting age discrimination in violation of Section 21.051 of the Texas Labor Code[5] and retaliation for complaining of age and gender discrimination in her December 3 email in violation of Section 21.055.[6] The case was tried to a jury over three weeks. To Question 1—"Was age a motivating factor in [Apache's] decision to discharge [Davis]?"—the jury answered "no", thus refusing to find for Davis on her age-discrimination claim. By "yes" answers to Questions 3 and 4, the jury found that Davis' December 3 email was "a complaint of age or gender discrimination" for which Apache had discharged her. The jury was instructed that Davis was required to "establish that without her filing a complaint of age or gender discrimination, . . . Apache Corporation's discharge . . . would not have occurred when it did." The jury was further instructed that "[t]here may be more than one cause for an employment decision" and that Davis was not required to establish that her "complaint of age or gender discrimination . . . was the sole cause" of Apache's decision to terminate her. In answer to Question 5, the jury found that "Davis engage[d] in misconduct for which [Apache] would have legitimately discharged her solely on that basis." Apache moved the court to disregard the jury's answer to Question 4, based on its finding in Question 5 that Apache would have

---

[5] *See* TEX. LAB. CODE § 21.051 ("An employer commits an unlawful employment practice if because of . . . age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with . . . employment . . . .").

[6] *Id.* § 21.055(1)–(2) ("An employer . . . commits an unlawful employment practice if [it] retaliates . . . against a person who . . . (1) opposes a discriminatory practice [or] (2) makes or files a charge . . . .").

legitimately discharged Davis solely for her misconduct. The court denied the motion. The jury awarded Davis $150,000 for past noneconomic damages but no damages for back pay or future compensatory damages. After a bench trial on attorney fees, the trial court signed a judgment against Apache for more than $900,000, including interest and $767,242 in attorney fees.

On appeal, Apache argued that Davis had not exhausted her administrative remedies for her claim of gender discrimination because she had not mentioned it in her EEOC complaint.[7] The court of appeals disagreed, reasoning that Davis referenced her December 3 email in a response she made to a question from the TWC and that gender discrimination was factually related to her claim of age discrimination, which she clearly asserted in her complaint.[8] Apache argued that there was no evidence that Davis had a good-faith, objectively reasonable belief that Apache engaged in gender discrimination and that Davis' email did not "sufficiently identify acts of age and gender discrimination to constitute a protected activity",[9] as required by *Alamo Heights Independent School District v. Clark*.[10] The court disagreed, concluding that Davis' email's single, general reference to Apache's "pervasive negative attitude toward advancing or recognizing the contributions or accomplishments of its female employees" put the company on notice of her complaint[11] and that Davis' observations of women who had not received promotions and men who had been hired were evidence that she had a good-faith, objectively reasonable belief that Apache engaged in gender discrimination.[12] Apache argued that there was no evidence that but for

---

[7] 573 S.W.3d at 489–490.

[8] *Id.* at 490–491.

[9] *Id.* at 493–494.

[10] 544 S.W.3d 755, 786–787 (Tex. 2018).

[11] 573 S.W.3d at 494.

[12] *Id.* at 498.

Davis' complaint of gender discrimination in her December 3 email, Apache would not have terminated her when it did because it already had undisputed, legitimate grounds for discharging her: her refusal to submit a compliant work schedule and her insistence on working unapproved overtime.[13] The court held that the factors courts use to assess whether retaliation is a but-for cause of termination showed that the jury's finding was supported by sufficient evidence.[14] The court rejected Apache's argument that the $767,242 in attorney fees awarded were excessive except to remit $70,626, which Davis accepted.[15] The court affirmed the judgment as modified.[16]

We granted Apache's petition for review. Apache renews here its arguments in the court of appeals. We find it necessary to address only Apache's argument regarding the sufficiency of the evidence to support the jury's finding that but for Davis' complaint of gender discrimination in her December 12 email, Apache would not have terminated her when it did.[17]

## II

### A

We first set the standard for proving causation in a retaliation case in *Texas Department of Human Services v. Hinds*.[18] Hinds claimed that the Department's personnel actions against him

---

[13] *Id.* at 498, 500.

[14] *Id.* at 501–502.

[15] *Id.* at 505.

[16] *Id.*

[17] We do not address one aspect of Apache's argument: that the jury's finding in Question 5—"Davis engage[d] in misconduct for which Apache . . . would have legitimately discharged her solely on that basis"— conclusively negates its finding in Question 4 that Apache discharged her for making her complaint. While Apache made that argument in the trial court, it did not make the argument in the court of appeals and has thus failed to preserve it here. *See Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) (observing that "ordinarily, an appellant waives any complaint about the trial court's judgment that is not raised in the court of appeals").

[18] 904 S.W.2d 629, 634 (Tex. 1995).

were for reporting conduct that he believed was unlawful[19] and thus were in violation of the Texas Whistleblower Act.[20] The Department responded that it had disciplined Hinds solely for documented performance problems completely unrelated to his reports of unlawful conduct.[21] In analyzing what the causal connection between protected activity and an unlawful response must be to establish liability under the Act, we reasoned that "[a]n employer who has sufficient sound reasons for discharging an employee should not incur liability merely for disliking the employee for reporting illegal conduct when that dislike played no part in the disputed personnel actions."[22] As the United States Supreme Court had written in an employment-discrimination case:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But the same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.[23]

We held in *Hinds* that "the standard of causation in whistleblower and similar cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did."[24] Without this requirement, we observed, the Whistleblower Act could be applied to "give public employees life tenure for reporting activity

---

[19] *Id.* at 631–632.

[20] The Legislature has amended the Whistleblower Act since *Hinds* was decided. Today it provides that "[a] state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE § 554.002; *see also id.* § 554.003 ("A public employee whose employment is suspended or terminated or who is subjected to an adverse personnel action in violation of Section 554.002 is entitled to sue for [damages and other relief].").

[21] 904 S.W.2d at 632.

[22] *Id.* at 635.

[23] *Id.* at 636 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–286 (1977)).

[24] *Id.*

believed in good faith to be unlawful", which was not the statute's intent.[25] We reasoned that this *would not have occurred when it did* standard "best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon,"[26] though we added that an employee is not required "to prove that his reporting illegal conduct was the sole reason for his employer's adverse actions."[27] And in *Alamo Heights Independent School District v. Clark*, we held that the same but-for causation standard applies in cases alleging retaliation for opposing discriminatory practices under Section 21.055.[28] Federal caselaw, which our jurisprudence parallels,[29] agrees.[30]

The but-for causation standard prevents "an employee who knows that . . . she is about to be fired for poor performance" from profiting off of "an unfounded charge of . . . discrimination" made to protect herself from an "unrelated employment action".[31] An employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."[32]

**B**

---

[25] *See id.* at 633.

[26] *Id.* at 636.

[27] *Id.* at 634.

[28] 544 S.W.3d 755, 782–783, 790 (Tex. 2018).

[29] *See id.* at 781 ("In discrimination and retaliation cases under the [Texas Commission on Human Rights Act], Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes . . . .").

[30] *See, e.g.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." (citation omitted)); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) ("We have consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated.").

[31] *Nassar*, 570 U.S. at 358.

[32] *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

A year after *Hinds*, we held in *Continental Coffee Products Co. v. Cazarez* that the same but-for causation standard applies in an action alleging retaliation for asserting a workers' compensation claim.[33] The court of appeals' decision in *Cazarez* did not refer to *Hinds*, which had issued a week earlier.[34] Instead, "without taking *Hinds* into account," the court of appeals had analyzed the plaintiff's circumstantial evidence of causation using five factors that it had distilled from decisions of other courts of appeals, including:

> (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false.[35]

We noted that "[n]either party ha[d] properly questioned" the multi-factor analysis that the court of appeals had employed instead of the but-for causation standard prescribed by *Hinds* and that under either test, the result was the same for Continental Coffee and Clark.[36] But we never suggested that the factors are a substitute for *Hinds*' but-for standard.

We have repeated and utilized the factors for analyzing circumstantial evidence listed in *Continental Coffee* in several cases, notably *City of Fort Worth v. Zimlich*,[37] *Alamo Heights*,[38] and *Rodriguez*,[39] but we have never used them as a replacement for the *Hinds* standard.[40] The factors

---

[33] 937 S.W.2d 444, 450 (Tex. 1996).

[34] *Id.*

[35] *Id.* at 451 (quoting 903 S.W.2d 70, 77–78 (Tex. App.—Houston [14th Dist.] 2005)).

[36] *Id.*

[37] 29 S.W.3d 62, 69 (Tex. 2000).

[38] 544 S.W.3d 755, 789–792 (Tex. 2018).

[39] 605 S.W.3d 183, 192–193 (Tex. 2020).

[40] *See id.* at 192; *Alamo Heights*, 544 S.W.3d at 790–791; *Zimlich*, 29 S.W.3d at 67–68.

18

may be more helpful in some cases and less in others. Some of the factors may actually be a distraction.

In this case, for example, the court of appeals concluded that Apache's termination of Davis not quite eight weeks after her December 3 email "supports an inference of retaliation."[41] But while a longer delay might support an inference that the email could not have been a but-for cause of her termination, the shorter delay is no evidence that Apache would not have terminated Davis if she had not sent the email, given that evidence of Davis' prior insubordination is undisputed. Though Davis was terminated shortly after her email, it had still been only a short while since her insubordination in refusing to submit a work schedule and perform overtime in compliance with company policy. Indeed, the email itself was insubordinate. Similarly, evidence that Ricotta knew of Davis' email and expressed a negative attitude toward her is no evidence that Apache would not otherwise have terminated her when it did, since Ricotta also knew of her insubordination and, according to Davis' email, had expressed a negative attitude toward her for that alone, to the point of almost terminating her. "[E]vidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events."[42] Moreover, Ricotta's negative attitude toward Davis was at least as likely due to the many insubordinate accusations repeated in her email as to the single sentence vaguely alleging Apache's "negative attitude" toward its female employees. In any event, as we observed in *Alamo Heights*, "[c]arrying out a previously planned

---

[41] 573 S.W.3d 475, 499 (Tex. App.—Houston [14th Dist.] 2019) (substitute opinion).

[42] *Zimlich*, 29 S.W.3d at 69.

19

employment decision is no evidence of causation",[43] even if the employment decision was "contemplated[] though not yet definitively determined".[44]

The court of appeals concluded:

> While not all factors courts use to assess evidence of but-for causation support Davis's claim, the factors of timing, knowledge of the complaint by the decision-maker, evidence of a negative attitude by Ricotta towards Davis after she filed her complaint, and evidence the employer's stated reasons for termination changed over time support the jury's finding.[45]

But, for the reasons just explained, the first three factors the court mentioned do not support the jury's finding. And, as we shall show below, neither does the fourth. More importantly, determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations. Given the undisputed evidence of Davis' insubordination—including in the email itself—these factors do not support an inference that Apache would not have terminated Davis when it did but for her email's slim allegations of gender discrimination.

With that, we turn to a full review of the evidence of causation.

### III

The question is whether there is any evidence to support the jury's finding that but for Davis' one-sentence reference to discrimination in her December 3 email, Apache would not have terminated her when it did. As always, "we view the evidence in the light most favorable to the

---

[43] *Alamo Heights*, 544 S.W.3d at 790 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

[44] *Breeden*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

[45] 573 S.W.3d at 501–502.

verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not."[46]

Evidence of Davis' insubordination is undisputed. She repeatedly defied the directives of her supervisor, Ricotta, to submit a work schedule compliant with Apache's policy that all employees work during regular business hours, 7:30 a.m. to 5:30 p.m. Monday through Thursday and 7:30 a.m. to 11:30 a.m. on Friday, allowing for reasonable adjustments such as 6:30 a.m. to 4:30 p.m. or 8:00 a.m. to 6:00 p.m. Davis insisted on arriving between 8:30 a.m. to 10:00 a.m. and on being absent for an extended period on Tuesdays and Thursdays to drive her daughter to college. Davis was the only employee in the legal department who refused to submit a compliant schedule. Davis also violated the revised policy that employees not work overtime without approval. For years, Davis had worked extensive overtime hours, and she refused to comply with the change, at least once in direct violation of Ricotta's express directive. Before Davis sent her December 3 email, Ricotta had almost reached a decision to terminate Davis—eight on a ten-point scale—and Forbes, manager of Apache's Human Resources Department for North America, had concluded she must be let go. Davis' email acknowledged Ricotta's strong disapproval of her, to the point that "[i]t seems only a matter of time before you take the 'kill shot.'" Shortly after sending the email, Davis told Bernal that she no longer wanted to work for Ricotta.

The court of appeals concluded that differences between Davis' and Ricotta's testimony regarding the reasons he gave her for her termination is evidence that she would not have been terminated but for her complaints of gender discrimination in her email. But both Davis and Ricotta agreed on a critical matter: that Ricotta told her she was being terminated for working unapproved

---

[46] *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 783 (Tex. 2020) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

overtime, which she unquestionably did. True, there were differences in their testimony. Davis testified that Ricotta told her she was being terminated for arriving late to work, which Ricotta denied. And Ricotta testified that he also told Davis she was being terminated for making inappropriate comments in the workplace and for telling Bernal she no longer wanted to work for Ricotta. But those differences in their respective recollections of their conversation do not detract from their agreement that Davis was terminated for working unapproved overtime. Because Apache and Davis agree that unapproved overtime was an undisputed basis for her termination, there could be no evidence that she would not have been terminated but for her email.

Davis argues that her refusal to submit a compliant work schedule was not a reason for termination because Ricotta denied her a reasonable accommodation. But Ricotta offered accommodations that Davis refused. And, in any event, there is no evidence that she should have been treated differently from every other employee in the legal department, all of whom submitted compliant schedules. Davis argues that Ricotta's refusal to allow unapproved overtime was "setting [her] up to fail" because she could not get her work done. But there is no evidence to support her argument. On neither occasion when she violated the directive was there any suggestion that she would otherwise have failed to finish her work in a timely manner. Davis argues that no final decision had been made before she sent her email. But Forbes had told Ricotta to fire Davis before she sent her email, and as noted above, "[c]arrying out a previously planned employment decision is no evidence of causation",[47] even if the employment decision was "contemplated[] though not yet definitively determined".[48]

---

[47] *Alamo Heights*, 544 S.W.3d at 790 (citing *Breeden*, 532 U.S. at 272).

[48] *Breeden*, 532 U.S. at 272.

Davis argues that she would not have been terminated for repeated insubordination because the other two paralegals, Eldridge and Fielder, were not terminated for falsifying timecards. But evidence of disparate treatment of other employees' conduct requires that the employees' circumstances be "comparable in all material respects."[49] As the court of appeals acknowledged, "[t]o prove disparate discipline, the employee must usually show 'that the misconduct for which [she] was discharged was nearly identical to that engaged in by [other] employee[s] whom [the company] retained."[50] The court also noted that while "arriving late to work and not noting it on the timesheets is different than Davis' conduct," the jury could have found that the former was worse. But there was no evidence on which the jury could base a finding that Davis' repeated insubordination was lesser misconduct than tardiness. The reason for the requirement that only "nearly identical" misconduct can be compared is to prevent a factfinder from determining the relative seriousness of misconduct without evidence of the employer's view.

Davis argues that the post-email investigation was a sham, but it was directed by Bernal, whom she insisted be involved. In applying a lesser causation standard than but-for, we have stated that it is "not sufficient [for the plaintiff] to present evidence that the . . . investigation was imperfect, incomplete, or arrived at a possibly incorrect conclusion."[51] In any event, the investigation had nothing to do with Apache's reasons for terminating Davis for insubordination. Davis argues that her termination violated Apache's progressive-discipline policy, but the only evidence she cites is Forbes' testimony that progressive discipline was used in Davis' case. She does not point to any policy in the record. Davis argues that Apache misled the TWC, but there is

---

[49] *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam).

[50] 573 S.W.3d at 500 (quoting *Ysleta*, 177 S.W.3d at 917).

[51] *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003).

no evidence for her argument. Davis argues that Apache's lawyers made false statements at trial, but the only statements to which she points were simple disagreements about what happened. And again, none of these arguments suggest that Apache would not have terminated Davis for insubordination when it did.

Davis argues that there can be multiple causes of an employment action, and the jury was so instructed. Still, Davis was required to prove that but for her email, she would not have been terminated for insubordination. There is no evidence of that in this record. The evidence is all to the contrary. Davis' undisputed conduct gave Apache legitimate reason to terminate her for insubordination, and the company was on the verge of doing so when Davis sent her December 3 email. The email only added to her insubordination.

\* \* \* \* \*

There is no evidence that but for Davis' complaining of gender discrimination in her December 3 email, she would not have been terminated when she was. The judgment of the court of appeals is reversed and judgment rendered for Apache.

_____
Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 25, 2021